1
2
3
4
5
6
7
8                         UNITED STATES DISTRICT COURT

9                         EASTERN DISTRICT OF CALIFORNIA

10

11   JEFF S. HARNDEN,                         1:02-CV-06529-LJO-GSA-PC

12                    Plaintiff,              FINDINGS AND RECOMMENDATIONS
                                              RECOMMENDING DEFENDANTS' MOTION
13        v.                                  FOR SUMMARY JUDGMENT BE GRANTED
                                              IN PART AND DENIED IN PART
14
     KEY, et al.,                             (Doc. 111)
15
                                              OBJECTIONS, IF ANY, DUE IN TWENTY
16                    Defendants.             DAYS
                                          /
17

18        Jeff S. Harnden ("plaintiff") is a state prisoner proceeding pro se and in forma pauperis

19   in this civil rights action filed pursuant to 42 U.S.C. § 1983.  Now pending before the court is

20   defendants' motion for summary judgment.

21   A.    RELEVANT PROCEDURAL HISTORY

22        Plaintiff commenced this action on December 9, 2002.  The action is now proceeding on

23   the Fifth Amended Complaint ("Complaint") filed May 3, 2005, against defendants Key, Vogel,

24   and Keener ("defendants") for use of excessive physical force and retaliation, and against

25   defendant Key ("Key") for denial of appropriate medical care.  (Doc. 36.)  On February 22, 2007,

26   defendants filed a motion for summary judgment, statement of undisputed facts, and exhibit.

27   (Docs. 111-114.)  Plaintiff filed a response in opposition to the motion for summary judgment

28

                                                1

and a statement of disputed facts on April 5, 2007.[1]  (Docs. 124, 125.)  Plaintiff also filed

exhibits in support of his opposition on May 9, 2007.  (Doc. 128.)

**B.      SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate when it is demonstrated that there exists no genuine

issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c).  Under summary judgment practice, the moving party

> always bears the initial responsibility of informing the district court
> of the basis for its motion, and identifying those portions of "the
> pleadings, depositions, answers to interrogatories, and admissions
> on file, together with the affidavits, if any," which it believes
> demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the

burden of proof at trial on a dispositive issue, a Summary Judgment Motion may properly be

made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions

on file.'"  Id.  Indeed, summary judgment should be entered, after adequate time for discovery and

upon motion, against a party who fails to make a showing sufficient to establish the existence of

an element essential to that party's case, and on which that party will bear the burden of proof at

trial.  Id. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving

party's case necessarily renders all other facts immaterial."  Id.  In such a circumstance, summary

judgment should be granted, "so long as whatever is before the district court demonstrates that the

standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing

party to establish that a genuine issue as to any material fact actually does exist.  Matsushita Elec.

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the

existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings,

but is required to tender evidence of specific facts in the form of affidavits, and/or admissible

discovery material, in support of its contention that the dispute exists.  Rule 56(e); Matsushita,

475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material,

---

[1]Plaintiff was provided with notice of the requirements for opposing a motion for summary judgment by the
court in an order filed on September 29, 2005.  Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).  (Doc. 52.)

i.e., a fact that might affect the outcome of the suit under the governing law, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n</u>, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, <u>Wool v. Tandem Computers, Inc.</u>, 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." <u>T.W. Elec. Serv.</u>, 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" <u>Matsushita</u>, 475 U.S. at 587 (<u>quoting</u> Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the Motion for Summary Judgment, the Court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Rule 56(c). The evidence of the opposing party is to be believed, <u>Anderson</u>, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, <u>Matsushita</u>, 475 U.S. at 587 (<u>citing</u> <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962)(<u>per curiam</u>). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. <u>Richards v. Nielsen Freight Lines</u>, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), <u>aff'd</u>, 810 F.2d 898, 902 (9th Cir. 1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" <u>Matsushita</u>, 475 U.S. at 587 (citation omitted).

**C.     UNDISPUTED FACTS ("UF")**[2]

1.     Plaintiff is incarcerated at Corcoran State Prison.

_____

[2]The following facts are undisputed for the purpose of this motion.

2.     On December 9, 2002, plaintiff commenced this action by filing a complaint against defendants, for violation of his constitutional rights during a cell extraction on November 16, 2001, at Corcoran State Prison.

3.     Defendant Keener ("Keener") is a Correctional Lieutenant at Corcoran State Prison.

4.     Based on his training and experience as a correctional lieutenant, Keener is familiar with the policies and procedures of the California Department of Corrections and Rehabilitation ("CDCR") concerning the use of restraints, use of chemical agents, use of force, and escort techniques.

5.     Keener received basic academy training and has since completed courses in advanced supervision, sergeant's academy, and lieutenant's academy.

6.     Keener's training is updated periodically with on-the-job training as institutional regulations change.

7.     Defendant Vogel ("Vogel") is a Sergeant at Corcoran State Prison.

8.     Key is a Correctional Officer, currently assigned to work on Facility A-4 at Corcoran State Prison.

9.     The Security Housing Unit ("SHU") is a unit where inmates are placed for assaultive or recalcitrant behavior.

10.     Inmates housed in the SHU assault staff more often than inmates housed in the general population.

11.     On November 16, 2001, plaintiff and his cellmate Dustin ("Dustin") were housed in the SHU on Facility A-4 at Corcoran State Prison.

12.     On November 16, 2001, at approximately 8:30 a.m., correctional staff on Facility A-4 informed Vogel that plaintiff had placed his hand through the food port of his cell and would not relinquish his food tray, refusing to permit staff to close the port or retrieve the tray.

///

///

13.   Plaintiff held his food tray and placed his hand through the food port in order to draw the attention of supervisory correctional staff to his complaints about unsatisfactory mail service at the prison.

14.   When an inmate refuses to permit his food port to be secured, this presents a security risk because an inmate can assault staff through the unsecured opening in the cell.[3]

15.   If an inmate's cell is not secured, it disrupts the routine operation of the facility, and staff must take steps to secure the cell.

16.   When plaintiff refused to remove his hand from the food port, he caused a disruption to which correctional staff reacted.

17.   When an inmate refuses to relinquish his food tray, this presents a security risk because the inmate can break the tray into pieces that can be used as weapons.

18.   Until staff can retrieve the tray and ensure that the inmate is complying with prison rules, the facility cannot operate as usual.

19.   As long as plaintiff refused to remove his hand from the food port and relinquish his tray, a security risk existed at the facility.

20.   Vogel went to plaintiff's cell and attempted to persuade him to remove his hand from the food port and relinquish the tray, but plaintiff refused to comply.

21.   Vogel informed Keener of the incident concerning plaintiff.

22.   Vogel obtained the assistance of Psychiatric Technician M. Alvarez, who spoke to plaintiff, but plaintiff continued to refuse to comply with the staff's orders.

23.   Keener obtained administrative authorization from Captain Means to apply Oleoresin Capsicum (pepper spray), or use other reasonable force, if plaintiff continued to refuse orders.

///

---

[3]Plaintiff objects to this fact because he disagrees that an unsecured food port poses a security risk. Plaintiff argues that because a food port is only 6 inches tall and approximately 16 inches wide, there is no way to assault a guard through a food port unless the guard stands within arms reach. (Opp to UF at 9:9-26.) Plaintiff argues that a guard can avoid an assault by backing away from an unsecured food port. Id. The relevant fact is not that a guard cannot avoid being assaulted through an unsecured food port, but rather that an assault is more likely to occur if the food port is unsecured than if it is secured. Therefore, the objection is overruled.

5

24. Keener obtained medical clearance from Dr. V. Sanchez to apply pepper spray to plaintiff if he continued to refuse orders.

25. Vogel and Keener assembled a team of officers to assist in a cell extraction in the event that plaintiff continued to refuse orders.

26. The cell extraction team included an officer to apply the pepper spray, officers to secure the inmates' arms and legs in restraints, at least one officer to videotape the incident, and a Medical Technical Assistant ("MTA") and Licensed Vocational Nurse, to provide medical treatment if anyone was injured.

27. At approximately 9:30 a.m., Key was instructed to report to Facility A-4 to assist in removing plaintiff from his cell if he continued to refuse to comply with staff orders.

28. Vogel's role on the team was to apply pepper spray to plaintiff's cell if Keener was unsuccessful in gaining plaintiff's compliance.

29. At approximately 10:00 a.m., the team approached the front of the cell in which plaintiff was housed, but by then plaintiff had relinquished his food tray and removed his hand from the food port.

30. After plaintiff had complied with orders to relinquish the tray and remove his hand from the food port, Keener ordered that plaintiff and Dustin be removed from their cell, the inmates searched, and the cell searched.

31. Keener ordered plaintiff and Dustin to remove their clothing for an unclothed body search and voluntarily exit the cell, and although plaintiff responded that he would comply with this order, neither inmate complied.

32. Keener explained to plaintiff that if he refused to comply with his orders, the staff would use physical force, including pepper spray, to force him to comply, and plaintiff indicated that he understood, but neither inmate complied.

33. After the inmates refused to remove their clothing, Keener motioned for Vogel to apply the pepper spray through the opening in plaintiff's cell door, which Vogel did, using an MK 46 dispenser.

6

34. Once the pepper spray had been applied into the cell, Keener again ordered plaintiff and Dustin to remove their clothing for an unclothed body search, but both inmates continued to refuse for several minutes.

35. Eventually the pepper spray took affect, and the inmates began to cooperate, slowly and sporadically at first, causing Keener to repeat some of the instructions several times.

36. An unclothed body search is an important security measure used to detect contraband or weapons which an inmate may have hidden on or inside his body.

37. Correctional staff are instructed in procedures to follow when conducting an unclothed body search, as follows: The officer commands the inmate with a series of instructions, and after each instruction is followed, the officer visually inspects the inmate's body/and or body cavities for contraband or weapons. First, the inmate stands in front of the officer, facing the officer. Next, the inmate removes his clothing, keeping his hands to his sides. Next, the inmate extends his fingers and shows the front and back of his hands. Next, the inmate opens his mouth, lifts his tongue, moves his mouth, and pulls back his upper and lower lips. Next, the inmate turns his head to the left and right, and pulls each ear forward. If the inmate has long hair, he removes any braids or clips from his hair and thoroughly runs his fingers through his hair. Next, the inmate lifts his scrotum and testicles, and peels back the foreskin of his penis. Next, the inmate turns around and lifts one foot at a time, wiggling his toes. Finally, the inmate places his hands on the cheeks of his bottom, with his feet shoulder width apart, and squats at the knees three times, then bends over at the waist and coughs three times.

38. Inmates housed in the SHU routinely undergo unclothed body searches and are familiar with the series of steps they must perform to complete an unclothed body search.

39. Plaintiff has completed unclothed body searches and visual cavity searches hundreds of times throughout his incarceration.

| | |
|---|---|
| 1 | 40. | Both inmates complied with the unclothed body search, and then plaintiff placed his wrists through the cuff-port, Key handcuffed plaintiff, and Dustin was also handcuffed. |

40. Both inmates complied with the unclothed body search, and then plaintiff placed his wrists through the cuff-port, Key handcuffed plaintiff, and Dustin was also handcuffed.

41. Keener ordered plaintiff to kneel so the cell door could be opened, and another officer placed leg restraints on plaintiff.

42. Key then assisted plaintiff to stand and escorted him out of the cell.

43. Key and another officer faced plaintiff to the wall and held his arms while Dustin was removed from the cell.

44. Sergeant F. Martinez videotaped the cell extraction

45. As soon as both inmates were out of the cell, they were escorted out of the building to a grassy area just beside the building.

46. Key assisted in the escort by holding plaintiff's left arm and remaining close to him as they walked outside and as plaintiff was being rinsed with water.

47. MTA Garvin used a hose to spray cool water over the two inmates for several minutes to remove the pepper spray residue.

48. During the time that plaintiff was being rinsed off, he was wearing light cotton boxer shorts.

49. Key stayed close to plaintiff and kept a hand on his arm while plaintiff was being rinsed.

50. Key exerted pressure on plaintiff's handcuffs when plaintiff was being rinsed off.

51. After the MTA completed rinsing plaintiff, she medically evaluated him and cleared him to be returned to a cell.

52. Key and another officer escorted plaintiff back to his cell.

53. Plaintiff was placed on "management control status," which means he received minimal property in his cell.

54. Medical staff make rounds throughout the SHU each day, and inmates can make requests for interviews with them.

///

1    55.    After the cell extraction on November 16, 2001, plaintiff filed prison grievances
2           related to the cell extraction.

3    **D.    PLAINTIFF'S ALLEGATIONS**

4    The events at issue in the instant action allegedly occurred at Corcoran State Prison, where
5    plaintiff was incarcerated when the Complaint was filed.  Plaintiff's Complaint proceeds against
6    prison employees Vogel, Keener, and Key as defendants.  Plaintiff seeks money damages and
7    injunctive relief by way of a modification of the inmate grievance procedure at the prison.

8    In his Complaint, plaintiff alleges that during the morning of November 16, 2001, in order
9    to bring attention to his grievance about inadequate mail service at the prison, plaintiff refused to
10   remove his hand from the open food port of his cell and refused to relinquish a plastic food tray.
11   Plaintiff alleges that Dustin persuaded him to give up the tray and remove his hand from the food
12   port.  Plaintiff alleges that the food tray was placed atop a box outside the cell, the food port door
13   was closed, ending all disputes, and plaintiff and Dustin went to sleep.

14   Plaintiff alleges that later, Vogel yelled at plaintiff to turn on the lights in his cell, and
15   plaintiff responded that Vogel, not plaintiff, had control over the light switch and should turn the
16   lights on himself.  Plaintiff alleges that he and Dustin were then asked to remove their clothing
17   and submit to a search, and when they did not comply,  Keener yelled "Gas 'em," and defendants
18   sprayed a 60-80 ounce canister of pepper spray into the cell, soaking plaintiff and Dustin.
19   Plaintiff alleges that he then complied with Vogel's request and disrobed for the search.  Plaintiff
20   alleges that Vogel told plaintiff to show his "spinster muscle," referring to his sphincter muscle,
21   and fearful that he would be gassed again, plaintiff placed his finger, wet with pepper spray, into
22   his own anus, causing pain from the pepper spray against his skin.  Plaintiff alleges that
23   defendants then examined his genital area with intent to contaminate the body parts with pepper
24   spray.  Plaintiff alleges that defendants then restrained him with chains and turned the cell lights
25   on.  Plaintiff alleges he and Dustin were "gassed" because they did not turn on the lights as
26   ordered.  Plaintiff alleges that defendants videotaped the cell extraction.

27   Plaintiff alleges that when he told Key about his prison mail grievance and his need for
28   evidence for court, Key tightened plaintiff's handcuffs and pushed him into a wall, calling

9

plaintiff a "litigator" and asking if plaintiff intended to sue him. Plaintiff alleges that Key also threatened to break plaintiff's arm if he did not admit he was a child molester. Plaintiff alleges that Key caused him pain because of his commitment offense and the grievance he filed.

Plaintiff alleges that defendants sprayed him with ice-cold water to wash off the pepper spray, but this method was not effective and pepper spray remained on plaintiff's skin and continued to cause pain. Plaintiff alleges that his genital area was not sufficiently rinsed, and when he asked an MTA to wash off his scrotum and anus, Key wrenched his handcuffs to cause pain. Plaintiff also alleges that Vogel kicked plaintiff's chained bare feet apart and then stomped on the chain, and that Key used restraints to pull on plaintiff's arms, causing further pain and injury.

Plaintiff alleges that he told defendants he could not breathe and requested to see the MTA, but the request was refused. Plaintiff alleges he was returned to a cell, with the cold water turned off, the toilet turned off, and no soap.

Plaintiff claims he suffered injuries as a result of defendants' actions, i.e., the return of asthma which he had as a child; injury to his right arm; re-injury of his hand; and injury to his lungs from poisonous pepper spray.

**E.    CLAIMS FOR RELIEF**

**1.    Claim for Excessive Force**

Plaintiff alleges that defendants used excessive force against him during a cell extraction when they sprayed him with pepper spray. Plaintiff also alleges that Keener used excessive force when conducting an unclothed body search. Plaintiff also alleges that Key used excessive force against him when he kicked and shoved plaintiff and wrenched plaintiff's handcuffs.

**a.    Legal Standard**

 "What is necessary to show sufficient harm for purposes of the Cruel and Unusual Punishments Clause [of the Eighth Amendment] depends upon the claim at issue . . . ." Hudson v. McMillian, 503 U.S. 1, 8 (1992). "The objective component of an Eighth Amendment claim is . . . contextual and responsive to contemporary standards of decency." Id. (internal quotation marks and citations omitted). The malicious and sadistic use of force to cause harm always

violates contemporary standards of decency, regardless of whether or not significant injury is evident. Id. at 9; see also Oliver v. Keller, 289 F.3d 623, 628 (9th Cir. 2002) (Eighth Amendment excessive force standard examines de minimis uses of force, not de minimis injuries). However, not "every malevolent touch by a prison guard gives rise to a federal cause of action." Id. at 9. "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Id. at 9-10 (internal quotations marks and citations omitted).

"[W]henever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Id. at 7. "In determining whether the use of force was wanton and unnecessary, it may also be proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response." Id. (internal quotation marks and citations omitted). "The absence of serious injury is . . . relevant to the Eighth Amendment inquiry, but does not end it." Id.

### b. Defendants' Motion

Defendants argue that they did not use excessive force against plaintiff.

### I. Defendants Applied Pepper Spray in a Good-Faith Effort to Maintain and Restore Discipline

Defendants argue that they did not use excessive force against plaintiff, because when they applied pepper spray to plaintiff's cell, they made a good-faith effort to maintain and restore discipline. (Deft's M at 7.) There was a need to restore discipline because plaintiff delayed the normal functioning of the prison and jeopardized institutional security at Corcoran State Prison. (UF 12-19; Decl of Vogel at 2 ¶ 3-6; Decl of Keener at 3 ¶ 7-10.) It is undisputed that plaintiff intentionally placed his hand through the food port of his cell and refused to return his food tray to cause a disruption. (UF 12, 13; Depo of Harnden at 23, 24, 27, 28 .) It is also undisputed that

plaintiff presented a security threat by holding a plastic tray that could be turned into weapons. (UF 17-19; Decl of Vogel at 2 ¶ 5; Decl of Keener at 9.)  It is also undisputed that after plaintiff returned the tray and removed his hand from the food port, he initially refused to comply with orders to cooperate in being removed from his cell and searched.  (UF 30, 31, 32; Decl of Vogel at 3 ¶ 10.; Decl of Keener at 4 ¶ 20.)

Defendants also allege that the officers, including Keener and Vogel, gave plaintiff every opportunity to avoid being pepper sprayed.  (Deft's M at 8 ¶ 1:2-3.)  It is undisputed that defendants attempted to verbally persuade plaintiff to comply with orders.  (UF 31; Decl of Keener at 4 ¶ 17.)  It is undisputed that Keener warned plaintiff that they would use force if plaintiff did not comply.  (UF 32; Decl of Keener at 4 ¶ 17.)  Defendants allege that because plaintiff would not voluntarily comply, they had no choice but to use the reasonable force they applied to obtain plaintiff's compliance.  (Deft's M at 8 ¶ 1:4-6.)

### ii.     Defendants attempted to temper the severity of their response

Defendants also argue they attempted to temper the severity of their forceful response. (Deft's M at 8:7.)  Defendants allege that Vogel obtained psychiatric intervention in an effort to avoid the need for physical force at all.  (Deft's M at 8:7-8.)   It is undisputed that Vogel obtained the assistance of Psychiatric Technician M. Alvarez, who spoke to plaintiff, but plaintiff continued to refuse to comply with orders to remove his hand from the food port and relinquish the tray.  (UF 22; Decl of Vogel at 2 ¶ 7.)  Defendants allege that Keener obtained medical clearance to make sure plaintiff had no preexisting conditions that would cause pepper spray to injure him.  (Deft's M at 8:9-10.)  It is undisputed that medical clearance was obtained from Dr. V. Sanchez to apply pepper spray to plaintiff if he continued to refuse orders.  (UF 24; Decl of Keener at 4 ¶ 12.)  The cell extraction team assembled by defendants included an MTA and Licensed Vocational Nurse to provide medical treatment if anyone was injured.  (UF 26; Decl of Keener at 4 ¶ 14.)  Defendants allege that the officers ensured plaintiff was thoroughly washed off with water following the application of pepper spray.  (Deft's M at 8:11-12.)  Defendants allege that Key escorted plaintiff outside to a grassy area where an MTA ran cool water over his body for several minutes to remove any pepper spray residue.  (Decl of Key at 2 ¶ 7.)  Defendants also

allege that Keener and Vogel ensured that floor staff in Facility A-4 washed plaintiff's cell with soap and water before he was rehoused. (Deft's M at 8:12-14.) Defendants allege that Vogel ensured that floor staff on Facility A-4 searched plaintiff's cell and decontaminated the cell with soap and water before returning him to his cell. (Decl of Vogel at 4 ¶ 19.)

### iii.    Plaintiff suffered no physical injuries

Defendants also allege that plaintiff suffered no physical injuries. (Deft's M at 8:15-17.) After the MTA completed rinsing plaintiff, she medically evaluated him and cleared him to be returned to a cell. (UF 53.) Defendants allege the MTA observed no visible injuries to plaintiff. (CDC 7219 Medical Report dated 11/16/01.) Defendants further allege that plaintiff made no complaints to the MTA of breathing difficulties. (Deft's M at 8:17.)

### iv.    The Unclothed Body Search Was a Security Measure

Defendants allege that the unclothed body search was ordered by Keener as an important security measure, not as an attempt to harm plaintiff. (Deft's M at 8:18-19.) It is undisputed that plaintiff had been showing unusual and uncooperative behavior on November 16, 2001. (UF 12, 13, 16, 19, 21.) Defendants allege that plaintiff refused to surrender sharp objects to staff. (Deft's M at 8:21.) It is undisputed that plaintiff refused to relinquish his food tray, which presented a security risk because he could have broken the tray into pieces that could be used as weapons. (UF 12, 13, 17, 19.) It is also undisputed that Keener had training and experience and judged it necessary that plaintiff should complete an unclothed body search before exiting his cell. (UF 4, 5, 6, 30-32.) An unclothed body search is a valid security measure to ensure that an inmate does not have any contraband or weapons hidden on or inside his body. (UF 36.) Plaintiff had completed an unclothed body search hundreds of times, (UF 39.), and defendants allege that for this reason, plaintiff should have been able to complete the process quickly and easily. (Deft's M at 8:24-25.) Defendants also allege that officers permitted plaintiff to be thoroughly washed on all parts of his body immediately following the body search. (Deft's M at 8:25-26.)

### v.    Defendant Key Did Not Use Excessive Force Against Plaintiff

Defendants allege that Key did not use excessive force against plaintiff, as they allege can clearly be seen in the Video taken of the incident. (Deft's M at 9:1.;Video of Cell Extraction,

Doc. 112, Exh. A ("Video").)   It is undisputed that Sergeant F. Martinez videotaped the cell

extraction.  (UF 44.)  Defendant alleges that plaintiff's claims about being shoved and kicked by

Key are a figment of his imagination.  (Deft's M at 8-9:27-1.)  Key denies that he ever pushed

plaintiff into a wall, hit him, kicked him, manipulated his handcuffs to cause pain, or stood on his

leg restraints on November 16, 2001.  (Decl of Key at 2:21-22.)  Key alleges the Video shows all

of the contact between Key and plaintiff, and it shows that Key stood still, firmly holding plaintiff

toward the wall, while Dustin was removed from the cell.  (Video.)  Plaintiff alleges that Key

pulled down on his handcuffs when plaintiff asked the MTA to wash his genitals.  (Cmp at 6:4-5.)

Key admits he pulled down on plaintiff's handcuffs one time while plaintiff was being washed but

alleges this was done in an effort to maintain control after plaintiff made a sudden movement.

(See UF 50; Decl of Key at 2 ¶ 10.)   Defendants conclude that they did not use excessive physical

force against plaintiff, because all force they employed was reasonable and for the express

purpose of requiring plaintiff to comply with lawful orders necessary for the safe and efficient

operation of the prison.  (Deft's M at 9:8-10.),  and therefore their acts did not violate plaintiff's

rights under the Eighth Amendment to be free of cruel and unusual punishment.

      The court finds that defendants have met their initial burden of informing the court of the

basis of their motion and identifying those portions of the record which they believe demonstrate

the absence of a genuine issue of material fact.  The burden therefore shifts to plaintiff to establish

that a genuine issue as to any material fact actually does exist.  See Matsushita, 475 U.S. at 586.

In attempting to establish the existence of this factual dispute, plaintiff may not rely upon the mere

allegations or denials of his pleadings, but is required to tender evidence of specific facts in the

form of affidavits; and/or admissible discovery material, in support of its contention that the

dispute exists.  Rule 56(e); Matsushita, 475 U.S. at 586 n. 11; First Nat'l Bank, 391 U.S. at 289;

Strong v. France, 474 F2d. 747, 749 (9th Cir. 1973.)

      **c.**      **Plaintiff's Opposition**

      In his opposition, plaintiff has set forth evidence to rebut defendants' argument that they

only applied force to plaintiff in a good faith effort to restore or maintain discipline.  Because it is

undisputed that defendants applied pepper spray to plaintiff, the issue here is not whether

defendants applied force. The question is whether the force was used sadistically and maliciously, wantonly and unnecessarily, to cause harm.

The events of the early morning on November 16, 2001, are essentially undisputed. At about 8:30 a.m., plaintiff intentionally placed his hand through the food port of his cell, purposely causing a disruption to bring attention to his grievance about mail service at the prison. (UF 12, 13.) The open food port presented a security threat, because an officer can be assaulted through an open food port. (UF 14.) It is undisputed that plaintiff refused to return his food tray, which caused a security threat because a food tray can be broken into pieces that can be used as weapons. (UF 17-19.) Plaintiff initially refused to comply with Vogel's and Keener's orders to remove his hand from the food port and relinquish his food tray, but before any force was used, plaintiff complied with these orders. (UF 12, 29.) In the meantime, Keener had assembled a team of officers who were prepared to apply pepper spray to plaintiff if he did not comply with the orders. (UF 25-28.) The team included Vogel to apply pepper spray, officers to secure plaintiff's arms and legs, Key as the cuff-man, and an MTA and nurse in case anyone was injured. (UF 26.) At least one officer videotaped the events. (UF 44.) By the time the team was prepared to act and approached plaintiff's cell, plaintiff had complied with the orders to remove his hand and relinquish his tray. (UF 29.)

Plaintiff and defendants disagree about what happened next. Plaintiff alleges that the food tray was placed atop a box outside the cell, the food port door was closed, ending all disputes, and plaintiff and Dustin went to sleep. (Cmp at 4:24-27.) Plaintiff presents evidence that by about 10:00 a.m., no security risk remained because the food port incident was over. (Decl of Dustin; Exh E at 92.) The food tray had been relinquished and plaintiff had removed his hand from the food port. (UF 29.) Plaintiff presents evidence that he and Dustin went to sleep in the cell after the incident and before defendants approached with the pepper spray. (Cmp at 4:27.) Plaintiff alleges that Vogel ordered him to turn on the cell lights, and when he was unable to comply, plaintiff and Dustin were ordered to remove their clothing for a body search. (Cmp at 5:4.) When they did not comply, plaintiff alleges Keener yelled "Gas 'em," and Vogel soaked plaintiff and Dustin for 18-20 seconds with a large canister of pepper spray. (Opp at 4; Vogel Report at 3;

15

Exh A at 74.) They were then forced to remove their clothing and submit to an unclothed body search. (UF 31-40.) An unclothed body search is a procedure used to determine if an inmate has hidden contraband or weapons on or inside his body. (UF 36.) Plaintiff contends that during the search, defendants examined his genitals with intent to contaminate the body parts with pepper spray. (Cmp at 5:16-18; Decl of Dustin; Exh E at 93:19-24.) Plaintiff contends that defendants joked and laughed during the body search and made remarks such as "Show me your spinster [for sphincter]" and "Show me your hemorrhoids" while conducting the search, in a rude and humiliating way. (Opp at 21, 33; Decl of Dustin; Exh E at 92:31-36; Exh E at 93:8-10.) Plaintiff contends that the lights were off in the cell during the body search. (Decl of Dustin; Exh E at 90:17-20; Cmp at 5:18-19.)

Key put handcuffs on plaintiff and escorted him out of the cell. (UF 40-42.) Plaintiff contends that the videotape does not show the entire incident, because it does not show some of Key's involvement after plaintiff came out of the cell, including when Key moved plaintiff away from camera view and slammed him into a wall. (Opp at 7, 25, 39; Video.) Plaintiff contends that his eyes were closed when he heard Key say, "Look, he's crying," and when he opened his eyes he saw the video camera in his face. (Opp at 25.) Plaintiff contends that Key asked him why he had held his food tray and refused to remove his hand from the food port, and plaintiff told Key he needed evidence for court. (Cmp at 5:22-24.) Plaintiff contends that Key then tightened his handcuffs and bounced him into a wall. (Cmp at 5:25-26.) Plaintiff contends that Key called him a "litigator" and asked if he intended to sue him, and plaintiff answered affirmatively. (Cmp at 5:26-27; Opp at 15-16; Decl of Dustin; Exh E at 94.) Plaintiff was escorted outside to a grassy area to be rinsed off with cold water. (UF 45-47.) Plaintiff presents evidence that the operations manual used at Corcoran State Prison instructs that warm water and soap is necessary to remove pepper spray. (CSP Corcoran Operational Procedure Manual § 1011 at 10; Exh G at 106.) Plaintiff contends that Vogel was present when he asked to have his genitals washed with soap. (Opp at 34.) Keener directed Vogel to ensure that plaintiff's cell was decontaminated with soap and water. (Keener Decl at 6; Exh DD at 150.) Plaintiff contends that although he made a request to the MTA who was rinsing him, defendants refused to remove his

16

boxer shorts so that the pepper spray could be adequately rinsed from his genitals. (Cmp at 6:4-6.) Key admitted he exerted pressure on plaintiff's handcuffs while he was being rinsed. (UF 50.) Plaintiff contends that during the decontamination, when he complained that the handcuffs were too tight, Keener and Vogel walked over to plaintiff to check his handcuffs, and Vogel ordered C/O Vadnais to loosen them. (Vogel Incident Report at 3; Exh. A at 74; Opp at 21.) Plaintiff presents evidence that the videotape did not show everything that happened, because at no time on the video are Keener and Vogel seen walking over to look at plaintiff during the decontamination. (Opp at 3, 21; Video.) Plaintiff contends that after the decontamination, Key kicked plaintiff's feet apart and stomped on the chains between plaintiff's feet. (Opp at 39.) Plaintiff contends that when he was placed in a strip cell after the gassing, he spent 10 days without any cold water or a working toilet, because defendants turned them off. (Opp at 4.) Plaintiff submits evidence that when an inmate acts unusual, one step and precaution used by prison staff involves turning off the water to preclude an inmate from using water as a hazard or weapon against correctional staff. (Vogel Response to Interrogatory 6, Exh Y at 129.) Plaintiff contends that he suffered physical injuries, including swollen wrists (Opp at 3.), numbness in his fingers (Opp at 3, 29.), inability to breathe (Cmp at 5:11.), and pain in his eyes due to the pepper spray. (Opp., Exh B at 54.)

### d.    Court's Finding

The court finds that plaintiff has submitted sufficient evidence in support of his contention that a dispute about material facts exists about whether defendants used excessive force, facts which might affect the outcome of the suit under the governing law.

In their motion, defendants argue that their use of pepper spray was a good faith effort to restore discipline because plaintiff had created a security risk. There is no dispute that plaintiff intentionally caused a disruption and refused to follow orders, but plaintiff disagrees that a security risk existed after he returned the food tray. In the verified Complaint, plaintiff alleges that he relinquished the food tray and removed his hand from the food port, ending all disputes, and he and Dustin went to sleep before defendants approached with the pepper spray. As evidence, plaintiff presents a declaration by his cellmate Dustin, in which Dustin declares that by about 10:00 a.m. no security risk remained because the food port incident was over. Also in the

verified Complaint, plaintiff alleges that defendants' actions after the food port incident was over were taken because he would not turn on the light (which he was unable to do) and for retaliatory reasons. Therefore, there is a dispute of facts whether plaintiff's refusal to comply with orders after he returned the food tray caused a security risk.

Also at issue is whether plaintiff was thoroughly washed off with water following the application of pepper spray. Defendants claim that they tempered the severity of their forceful response by taking measures such as ensuring plaintiff was thoroughly washed off with water following the application of pepper spray. Plaintiff disagrees that he was thoroughly washed. Plaintiff submits a copy of the CPS Corcoran Operational Procedure Manual § 1011, showing instructions that warm water and soap is necessary to remove pepper spray. However, in the verified complaint plaintiff alleges he was rinsed with ice-cold water and when he asked the MTA to remove his boxer shorts so the pepper spray could be adequately rinsed from his genitals, she refused. Plaintiff does not dispute that his cell was washed with soap and water before he was rehoused; however, he argues that the washing of the cell caused the pepper spray to become airborne and injure his lungs, eyes, and skin.

The parties dispute whether plaintiff was physically injured by defendants. Defendants allege that plaintiff was not physically injured, offering evidence that the MTA medically evaluated plaintiff, did not observe visible injuries, and cleared him to be returned to a cell. However, these facts do not prove that plaintiff was not injured. Plaintiff maintains in his verified Complaint and opposition that his wrists were swollen from the handcuffs being too tight, his fingers were numb, his eyes hurt, and he could not breathe.

Defendants allege that when Keener ordered the body search and when Key pulled down on plaintiff's handcuffs, they were reacting to a security risk caused by plaintiff, not attempting to harm plaintiff. Plaintiff presents evidence that no security risk existed when the body search was conducted, because he had already removed his hand from the food port and relinquished his food tray. However, even if a security risk existed, this fact fails to show that defendants did not mean to harm plaintiff.

///

18

Defendant Key denies that he pushed, shoved, kicked, or hit plaintiff while holding plaintiff toward the wall.  As evidence, he submits the Video which he alleges shows Key standing still, firmly holding plaintiff toward the wall, while Dustin was removed from the cell. Plaintiff disagrees with Key's denial and alleges in his opposition that Key tightened his handcuffs and slammed him into the wall.  Key claims the Video shows all of the contact between Key and plaintiff, but plaintiff claims the Video does not include all of the contact between Key and plaintiff during the pepper spray incident, including when Key slammed him into the wall.

Based on the foregoing, plaintiff has presented evidence that material facts are at issue as to whether defendants used excessive force against him.  Therefore, defendants are not entitled to summary judgment on the issue of excessive force.

## 2.    Claim for Retaliation

### a.    Legal Standard

Plaintiff alleges that defendants retaliated against him for filing grievances, for his intention to file a lawsuit, and because of his commitment offense.  Allegations of retaliation against a prisoner's First Amendment rights to speech or to petition the government may support a section 1983 claim.  Rizzo v. Dawson, 778 F.2d 527, 532 (9th Cir. 1985); see also Valandingham v. Bojorquez, 866 F.2d 1135 (9th Cir. 1989); Pratt v. Rowland, 65 F.3d 802, 807 (9th Cir. 1995). An allegation of retaliation against a prisoner's First Amendment right to file a prison grievance is sufficient to support claim under section 1983.  Bruce v. Ylst, 351 F.3d 1283, 1288 (9th Cir. 2003).  "Within the prison context, a viable claim of First Amendment retaliation entails five basic elements:  (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal."  Rhodes v. Robinson, 408 F.3d 559, 567-68 (9th Cir. 2005).

Adverse action is action that "would chill a person of ordinary firmness" from engaging in that activity.  Pinard v. Clatskanie School Dist., 467 F.3d 755, 770 (9th Cir. 2006); White v. Lee, 227 F.3d 1214, 1228 (9th Cir. 2000); see also Lewis v. Jacks, No. 06-1995, 2007 WL 1374746, *2 (8th Cir. May 11, 2007); see also Thomas v. Eby, 481 F.3d 434, 440 (6th Cir. 2007); Bennett v.

Hendrix, 423 F.3d 1247, 1250-51 (11th Cir. 2005); Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 500 (4th Cir. 2005); Gill v. Pidlypchak, 389 F.3d 379, 381 (2d Cir. 2004); Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001). Both litigation in court and filing inmate grievances are protected activities and it is impermissible for prison officials to retaliate against inmates for engaging in these activities. However, not every allegedly adverse action will be sufficient to support a claim under section 1983 for retaliation. In the prison context, cases in this Circuit addressing First Amendment retaliation claims involve situations where the action taken by the defendant was clearly adverse to the plaintiff. Rhodes, 408 F.3d at 568 (arbitrary confiscation and destruction of property, initiation of a prison transfer, and assault in retaliation for filing grievances); Austin v. Terhune, 367 F.3d 1167, 1171 (9th Cir. 2004) (retaliatory placement in administrative segregation for filing grievances); Bruce v. Ylst, 351 F.3d at 1288 (retaliatory validation as a gang member for filing grievances); Hines v. Gomez, 108 F.3d 265, 267(9th Cir. 1997) (retaliatory issuance of false rules violation and subsequent finding of guilt); Pratt, 65 F.3d at 806 (retaliatory prison transfer and double-cell status in retaliation); Valandingham, 866 F.2d at 1138 (inmate labeled him a snitch and approached by other inmates and threatened with harm as a result); Rizzo v. Dawson, 778 F.2d 527, 530-32 (9th Cir. 1985) (retaliatory reassignment out of vocational class and transfer to a different prison).

### b. Defendants' Motion

Defendants claim they took no retaliatory actions against plaintiff. (Deft's M at 10:12-14,19.)

### i. There Was No Protected Activity as to Plaintiff's Commitment Offense

As to plaintiff's commitment offense, defendants argue that plaintiff has not stated a claim for retaliation, because plaintiff did not identify a protected activity. (Deft's M at 10:15-17.)

### ii. Defendant Key Had No Retaliatory Intent

As to Key, defendants argue he had no retaliatory intent when he acted, because he was not even familiar with plaintiff prior to being asked to assist in the cell extraction and was not even aware that plaintiff had filed any prison grievances. (Deft's M at 10:25-26; Decl of Key at 3 ¶ 12.)

### iii.    All Defendants Had No Retaliatory Intent

As to all defendants, defendants argue they did not act out of retaliation.  They maintain their actions were necessary to advance a legitimate correctional goal.  (Deft's M at 10:19-27.)  When plaintiff refused to remove his hand from the food port and relinquish his tray, he caused a disruption and a security risk to which correctional staff reacted.  (UF 14-19.)   An inmate can break a food tray into pieces that can be used as weapons.  (UF 17.)  Defendants allege that they were required to obtain plaintiff's compliance, remove him from the cell, and search him to protect institutional security.  (Deft's M at 10:20-23.)  Defendants allege that once plaintiff made it clear that he would not comply with staff orders voluntarily, applying pepper spray was the next, minimally forceful step.  (Deft's M at 10:21-22; Decl of Vogel at 2 ¶ 6.)  Keener ordered Vogel to apply pepper spray to the inside of plaintiff's cell, and Vogel sprayed pepper spray into the cell.  (UF 33; Decl of Vogel at 3 ¶ 11; Decl of Keener at 4 ¶ 21.)  Defendants also maintain their actions would have been necessary even if plaintiff had not filed any prison grievances or lawsuits.  (Deft's M at 10:23-25.)

### iii.    Defendants Did Not Turn Off the Water to Plaintiff's Cell Or Intentionally Rehouse Plaintiff In A Cell With Pepper Spray

Plaintiff alleges that defendants retaliated against by rehousing him in a strip cell without cold water or a working toilet and moving him to a cell that had been pepper sprayed.  (Cmp at 7:11-13, 21-22; Decl of Baxter L.2-13; Exh Z at 36.)  Defendants deny that they altered the water supply to plaintiff's cell and claim they had no knowledge there was any problem with water in plaintiff's cell.  (Decl of Key at 4 ¶ 18; Decl of Vogel at 4 ¶ 20; Decl of Keener at 6 ¶ 36.)  Defendants also deny they intentionally placed plaintiff in a cell that had been pepper sprayed, and in fact, actually ensured the cell was washed with soap and water before plaintiff was rehoused.  (Deft's M at 11:3-5.)   Defendants claim that Keener directed Vogel to ensure that floor staff on Facility A-4 decontaminated plaintiff's cell with soap and water before he was returned to the cell.  (Decl. Of Keener at 6 ¶ 33; Decl of Vogel at 4 ¶ 19.)

///

///

### iv.    Defendants' Actions Did Not Have a Chilling Effect on Plaintiff's Protected Activities

Defendants argue that their actions did not have a chilling effect on plaintiff's protected activities, because plaintiff filed the present lawsuit and also filed prison grievances related to the cell extraction incident.  (Deft's M at 11:6-7.)  It is undisputed that on December 19, 2002, plaintiff commenced this action by filing a complaint against defendants for violation of his constitutional rights during the November 16, 2001 cell extraction at Corcoran State Prison.  (UF 1,2.)  It is also undisputed that plaintiff filed prison grievances concerning the incident after the incident.  (UF 55.)

### c.    Court's Finding

The court finds that defendants are entitled to summary judgment on the retaliation claim.  Defendants have informed the court of the basis of their motion and have identified those portions of the record which demonstrate the absence of a genuine issue of material fact.  To prove a prima facie case for retaliation, plaintiff has the burden of proof at trial to show the existence of a chilling effect on his protected activities.   It is an undisputed fact that plaintiff has filed prison grievances and this lawsuit after the alleged retaliatory acts, proving that defendants' actions did not have a chilling effect on plaintiff's protected activities.  Plaintiff has not presented any evidence in opposition to this argument.  Therefore, defendants are entitled to judgment as a matter of law on the retaliation claim.  Fed. R. Civ. P.56(c).

### 3.    Claim for Denial of Adequate Medical Care

### a.    Legal Standard

Plaintiff alleges that Key denied him adequate medical care.  To constitute cruel and unusual punishment in violation of the Eighth Amendment, prison conditions must involve "the wanton and unnecessary infliction of pain." Rhodes v. Chapman, 452 U.S. 337, 347 (1981).  A prisoner's claim of inadequate medical care does not rise to the level of an Eighth Amendment violation unless (1) "the prison official deprived the prisoner of the 'minimal civilized measure of life's necessities,'" and (2) "the prison official 'acted with deliberate indifference in doing so.'" Toguchi v. Chung, 391 F.3d 1051, 1057 (9th Cir. 2004) (quoting Hallett v. Morgan, 296 F.3d 732, 744 (9th Cir. 2002) (citation omitted)).  A prison official does not act in a deliberately indifferent

manner unless the official "knows of and disregards an excessive risk to inmate health or safety." Farmer v. Brennan, 511 U.S. 825, 834 (1994). Deliberate indifference may be manifested "when prison officials deny, delay or intentionally interfere with medical treatment," or in the manner "in which prison physicians provide medical care." McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds, WMX Techs., Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc). Where a prisoner is alleging a delay in receiving medical treatment, the delay must have led to further harm in order for the prisoner to make a claim of deliberate indifference to serious medical needs. McGuckin, 974 F.2d at 1060 (citing Shapely v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985)).

### b. Defendants' Motion

Key argues that plaintiff did not show a serious medical need, and he did not disregard any medical need. (Deft's M at 12:2-3.)

### I. Plaintiff Did Not Show A Serious Medical Need

Key alleges that plaintiff never made a request to him for medical attention. (Decl of Key at 3:24-25.) Defendants allege that after the MTA completed rinsing the pepper spray from plaintiff, she medically evaluated him and cleared him to be returned to a cell. (Decl of Vogel at 4 ¶ 18; Decl of Keener at 6 ¶ 32.) Defendants also allege that the MTA did not observe any visible injuries on plaintiff. (CDC 7219 Medical Report dated 11/16/01.)

### ii. Key Did Not Disregard Any Medical Need

Key argues that plaintiff never asked him for medical care (Decl of Key at 3:24-25.) and he is not a nurse or doctor and is not qualified to provide medical treatment to inmates. (Decl of Key at 4 ¶ 17.) Furthermore, Key argues that plaintiff could have obtained medical attention without Key's assistance by submitting a request for an interview to the medical personnel who made daily rounds of Facility A-4. (Deft's M at 12:5-7.) It is undisputed that medical staff make rounds throughout the SHU each day, and inmates can make requests for interviews with them. (UF 54.)

The court finds that defendants have met their initial burden of informing the court of the basis of their motion and identifying those portions of the record which they believe demonstrate

the absence of a genuine issue of material fact. The burden therefore shifts to plaintiff to establish

that a genuine issue as to any material fact actually does exist. See Matsushita, 475 U.S. at 586.

In attempting to establish the existence of this factual dispute, plaintiff may not rely upon the mere

allegations or denials of his pleadings, but is required to tender evidence of specific facts in the

form of affidavits; and/or admissible discovery material, in support of its contention that the

dispute exists. Rule 56(e); Matsushita, 475 U.S. at 586 n. 11; First Nat'l Bank, 391 U.S. at 289;

Strong, 474 F2d. at 749.)

### c. **Plaintiff's Opposition**

In his verified opposition and Complaint (Doc. 36), plaintiff set forth evidence to rebut

Key's argument that he did not deny plaintiff adequate medical care. Plaintiff submits evidence

from his personal knowledge that he had serious medical needs. He alleges that his wrists were

painful and swollen from the handcuffs which Key made too tight. (Opp at 3:16-17.) He alleges

that he suffered from numbness in his fingers and bruises from the restraints, (Opp at 3:21-22, at

17:12.), which still affects his ability to draw illustrations. (Opp at 29:7-8.) Plaintiff also alleges

that the pepper spray caused his eyes to hurt, describing an immediate scratchy feeling as his eyes

rotated in their sockets. (Opp to UF at B49:16, B54:15-18.) Plaintiff also submits evidence that

he had asthma as a child, (Decl of Heriford; Exh F at 101:20-23.), which returned after the pepper

spray incident, (Cmp at 7:6-7; Opp at 31:10-11.), and he now uses a prescription inhaler

prescribed by a doctor at Corcoran State Prison. (Opp at 27.; Copy of Label for Albuterol Inhaler

from CSP Pharmacy.)

Plaintiff also submits evidence in his verified opposition that Key knew about his medical

needs and denied him medical care. Plaintiff alleges that when Key was escorting him back to his

cell, plaintiff yelled "I can't breathe!" (Opp at 10:9-10.) Plaintiff alleges that the handcuffs were

too tight and submits evidence that Vogel and Keener ordered Key to loosen the handcuffs. (Opp

to UF at B27:17-19; CDC-837 Vogel Incident Report Exh A at 74:8-10; CDC-837 Vadnais

Incident Report Exh A at 75:4-7.) Plaintiff contends he was denied medical care for asthma by

Key who deliberately ignored him. (Opp at 40:25-26.) Plaintiff submits evidence that he and

Dustin asked to see medical personnel because they could not breathe; plaintiff complained

numerous times about trouble breathing and yet was put back into the same cell without it being fumigated; and medical personnel were never called for either of them, and instead all they received were snide comments and smirks from the correctional staff. (Dustin's Decl, Exh E at 95:6-9.) Plaintiff alleges that when he was shoved into the strip cell, he said "I can't breathe, I want to see the MTA," and the response was "Fuck you" or something similar. (Cmp at 7:13-14.) Plaintiff alleges that for a year he was refused treatment for his asthma, and then inhalers for asthma were ordered for him. (Cmp. At 7:25-26.)

Plaintiff alleges that when he was placed in a strip cell after the pepper spray incident, he had no pen or paper to make a request for medical assistance. (Opp at 4:5-6.) It is undisputed that plaintiff was placed on "management control status," which means he received minimal property in his cell. (UF 53.) Plaintiff submits evidence that when he was placed on "management control status," he was not allowed anything in his cell other than a mattress, a blanket, a pair of shower shoes, and boxer shorts. (CDC 128-B Chrono; Exh A at 86:6-7.)

### d. Court's Finding

The court finds that plaintiff has submitted sufficient evidence in support of his contention that a dispute about material facts exists as to whether Key denied him adequate medical care, facts which might affect the outcome of the suit under the governing law.

The facts are disputed whether plaintiff had serious medical needs and whether defendant Key disregarded them. Although Key points out that the MTA examined plaintiff and cleared him because no visible injuries were present, this fact does not prove that plaintiff was not injured. In the verified Complaint and opposition, plaintiff claims his wrists were painful and swollen, his eyes hurt, he suffered from numbness in his hands and arms, he had bruises, and he could not breathe. Key claims he was not aware plaintiff had injuries and did not disregard plaintiff's medical needs, but plaintiff alleges that he yelled, "I can't breathe!" when Key was escorting him back to his cell. Key argues that plaintiff could have obtained medical care elsewhere, but this does not support his argument that he did not deny medical care to plaintiff. Based on these factual disputes, Key is not entitled to summary judgment on the issue of denial of adequate medical care.

## F.    DEFENSE OF QUALIFIED IMMUNITY

### 1.    Qualified Immunity

#### a.    Legal Standard

Defendants argue that they are entitled to qualified immunity as to all of plaintiff's claims. (Deft's M at 12:11.)  Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  In ruling upon the issue of qualified immunity, the initial inquiry is whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the defendant's conduct violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 201 (2001).  If, and only if, a violation can be made out, the next step is to ask whether the right was clearly established. Id.  The inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition . . . ." Id..  "[T]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense:  The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id..

#### b.    Excessive Force

In resolving these issues, the court must view the evidence in the light most favorable to plaintiff and resolve all material factual disputes in favor of plaintiff. Martinez v. Stanford, 323 F.3d 1178, 1184 (9th Cir. 2003).  In the Complaint, plaintiff alleges that he and Dustin were sleeping in their cell when Vogel approached the cell and ordered plaintiff to turn on the lights in the cell.  Plaintiff told Vogel he could not turn on the lights because he did not have control of the light switch.  According to plaintiff, he and Dustin were "gassed" because they did not turn on the lights as asked.   Plaintiff has submitted evidence that defendants ordered him to submit to an unclothed body search, and when he did not immediately comply, Keener yelled "Gas 'em," and defendants sprayed a 60-80 ounce canister of pepper spray into the cell, soaking plaintiff and Dustin.  Plaintiff submitted to the body search, during which plaintiff alleges defendants examined his genital area with intent to contaminate the body parts with pepper spray.

///

Plaintiff alleges defendants acted for reasons other than a good faith effort to maintain or restore discipline. According to plaintiff, in retaliation for plaintiff filing prison grievances and intending to file a lawsuit, Key tightened plaintiff's handcuffs and pushed him into a wall, causing pain and swelling in his wrists. Plaintiff alleges that Key also threatened to break his arm if he did not admit he was a child molester. Plaintiff alleges that Key also wrenched his handcuffs when plaintiff asked the MTA to rinse pepper spray from his genital area. Plaintiff alleges that Key kicked his feet apart and stomped on the chain restraining his feet. Plaintiff has presented evidence that he was placed in a cell which was contaminated with pepper spray. These facts are sufficient to show that defendants violated plaintiff's rights to freedom from excessive force under the Eighth Amendment. Accordingly, the first prong of the qualified immunity inquiry set forth in Saucier has been met. Saucier, 533 U.S. at 201.

Turning to the second prong, the court must determine whether the constitutional right was clearly established. Id. When a prison official stands accused of using excessive physical force in violation of the cruel and unusual punishment clause of the Eighth Amendment, the question turns on whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically for the purpose of causing harm. Hudson, 503 U.S. at 7 (citing Whitley v. Albers, 475 U.S. 312, 320-21 (1986)). In determining whether the use of force was wanton and unnecessary, it is proper to consider factors such as the need for application of force, the relationship between the need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of the forceful response. Hudson, 503 U.S. at 7. The extent of a prisoner's injury is also a factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation. Id. Although the absence of serious injury is relevant to the Eighth Amendment inquiry, it is not determinative. Id. That is, use of excessive physical force against a prisoner may constitute cruel and unusual punishment even though the prisoner does not suffer serious injury. Id. at 9.

At the time of the incident on November 16, 2001, the law with respect to excessive force claims was "sufficiently clear that a reasonable official would understand that what he is doing violates that right," Saucier, 533 U.S. at 202, and defendants make no argument to the contrary.

27

No reasonable officer would have believed that soaking an inmate with pepper spray because the inmate was not capable of complying with an order to turn on the lights in his cell, and tightening his handcuffs and pushing him into a wall in retaliation for filing a prison grievance, was force "applied in a good-faith effort to maintain or restore discipline." Due to the existence of material factual disputes concerning what occurred during the incident where pepper spray was used, defendants are not entitled to qualified immunity on the excessive force claim.

### c.   Denial of Adequate Medical Care by Key

As stated above, the court must view the evidence in the light most favorable to plaintiff and resolve all material factual disputes in favor of plaintiff. Martinez, 323 F.3d at 1184. In his Complaint, plaintiff alleges that when defendants discharged a canister of pepper spray onto his body, he could not adequately breathe and he suffered lasting injury to his lungs. Plaintiff alleges that when Key was escorting him back to his cell after he was rinsed off, plaintiff yelled, "I can't breathe," but Key ignored him. Plaintiff alleges that when he was shoved into the strip cell, he said "I can't breathe, I want to see the MTA," and the response was "Fuck you" or something similar. Plaintiff alleges that his injuries included a recurrence of asthma, which he had as a child. Plaintiff also alleges that when he was returned to a cell, he did not have access to a pen or paper and therefore was not able to request an interview with medical staff. Plaintiff alleges that for a year he was refused treatment for his asthma, and then inhalers for asthma were ordered for him. These facts are sufficient to show that Key violated plaintiff's rights to adequate medical care under the Eighth Amendment. Accordingly, the first prong of the qualified immunity inquiry set forth in Saucier has been met. Saucier, 533 U.S. at 201.

Turning to the second prong, the court must determine whether the constitutional right was clearly established. Id. To constitute cruel and unusual punishment in violation of the Eighth Amendment, prison conditions must involve "the wanton and unnecessary infliction of pain." Rhodes, 452 U.S. at 347. A prisoner's claim of inadequate medical care does not constitute cruel and unusual punishment unless the mistreatment rises to the level of "deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106 (1976). The "deliberate indifference" standard involves an objective and a subjective prong. First, the alleged deprivation

must be, in objective terms, "sufficiently serious." <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994) (citing <u>Wilson v. Seiter</u>, 501 U.S. 294, 298 (1991)). Second, the prison official must act with a "sufficiently culpable state of mind," which entails more than mere negligence, but less than conduct undertaken for the very purpose of causing harm. <u>Farmer</u>, 511 U.S. at 837. A prison official does not act in a deliberately indifferent manner unless the official "knows of and disregards an excessive risk to inmate health or safety." <u>Id</u>. At the time of the incident on November 16, 2001, the law with respect to medical care claims was "sufficiently clear that a reasonable official would understand that what he is doing violates that right," <u>Saucier</u>, 533 U.S. at 202, and Key makes no argument to the contrary. Therefore, the second prong of the qualified immunity inquiry set forth in <u>Saucier</u> has been met. <u>Id</u>. at 201. At the time of the November 16, 2001, incident, a reasonable official would understand that deliberately ignoring an inmates cries that "I can't breathe" after the inmate had been extensively sprayed with pepper spray would violate the inmate's right to adequate medical treatment. Due to the existence of material factual disputes concerning the seriousness of plaintiff's injuries and whether Key knew about and disregarded plaintiff's need for medical care, Key is are not entitled to qualified immunity on the medical care claim.

### d. Court's Finding

Due to the existence of material factual disputes concerning what occurred during the November 16, 2001, incident which included the use of pepper spray, defendants are not entitled to qualified immunity.

## G. CONCLUSION AND RECOMMENDATION

Based on the foregoing, it is HEREBY RECOMMENDED that defendants' motion for summary judgment, filed February 22, 2007, be GRANTED as to plaintiff's retaliation claim and DENIED as to all other claims. This will result in the case proceeding against defendants Vogel, Key, and Keener for excessive force, and against defendant Key for denial of medical care.

The Court further ORDERS that these Findings and Recommendations be submitted to the United States District Court Judge assigned to this action pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District

Court, Eastern District of California.  Within TWENTY (20) days after being served with a copy of these Findings and Recommendations, any party may file written Objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Replies to the Objections shall be served and filed within TEN (10) <u>court</u> days (plus three days if served by mail) after service of the Objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(c). The parties are advised that failure to file Objections within the specified time may waive the right to appeal the Order of the District Court.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).


          IT IS SO ORDERED.

     **Dated:    January 16, 2008**          **/s/ Gary S. Austin**
                                          UNITED STATES MAGISTRATE JUDGE